UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SCOTT MYERS,

        Plaintiff,

vs.

Case No. 06-CV-11252
HON. GEORGE CARAM STEEH

OFFICE DEPOT, INC.,

        Defendant.

_____/

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

INTRODUCTION

Plaintiff, Scott Myers, was employed by defendant as a Business Development Manager 1 (BDM 1) at defendant's Plymouth, Michigan office.[1] During his employment at Office Depot, plaintiff was openly homosexual. Plaintiff worked from September 11, 2002 until he was terminated on November 1, 2005. After being fired, plaintiff brought suit alleging hostile work environment, quid pro quo harassment and retaliation. Because the court agrees that defendant has not demonstrated that he was harassed on the basis of sex, the alleged harasser was not a supervisor at the time of the alleged harassment and the evidence demonstrates that the defendant had legitimate reason to fire the plaintiff, the defendant's motion is granted for reasons more fully explained below.

**I. Background**

---

[1] Defendant states that he started out as an Account Representative, but that his title was later changed to BDM.

During plaintiff's tenure as defendant's employee, plaintiff was placed on a Performance Improvement Process ("PIP") on October 8, 2004, by his supervisor Kevin Davis. Plaintiff complained about a number of events in a September 28, 2004 letter to Human Resources Manager Rebecca Essenbur-Kalch, specifically that he was unable to reach sales goals because he was being harassed and had not received adequate sales support.

The defendant annually sponsors a yearly kickoff event to motivate its sales people, and plaintiff states his termination was caused by events that occurred at the Kickoff meeting in the first half of 2005, which was held in Orlando, Florida. According to plaintiff, during one of the nights of the Kickoff event, defendant held a event where alcohol was served and after the event the personnel from defendant's Plymouth Office went to a bar. While at the bar, plaintiff had an intense conversation with Ron Sorey, who was his co-worker at the time. After the conversation was over, when plaintiff was in the bathroom, another co-worker told the plaintiff to enter a bathroom stall. Plaintiff states that once he entered the stall Sorey "grabbed me and tried to kiss me." The plaintiff then left the bathroom and avoided any further physical contact with Sorey.

In September 2005, Kevin Davis, plaintiff's former supervisor was demoted from District Sales Manager. Defendant promoted Ron Sorey to become plaintiff's supervisor. Plaintiff asserts that from the time that Sorey was promoted, Sorey tried to pressure plaintiff to leave the company.

The plaintiff and Sorey had two meetings shortly after the time that Sorey became the plaintiff's supervisor. During plaintiff's first meeting with Sorey, Sorey asked plaintiff "whether he felt his current job was the right fit for him" and told him to "take the

weekend to think about it." Defendant states that Sorey asked this question of all three underperforming employees with whom he met and that all three were treated the same.

During plaintiff's second meeting with Sorey on September 15, 2005, Sorey brought along Linda Chomin, another supervisor, as a witness. According to plaintiff, Sorey was confrontational and requested that the plaintiff quit when Sorey stated, "why would you want to stay at a place that treated you so unfairly?" The meeting "came to a head" when plaintiff mentioned the events in Florida. Plaintiff asked Sorey three times if he would like to explain to Chomin what happened in Florida. At the end of the meeting, plaintiff was presented with a PIP, which plaintiff refused to sign. The two other underperforming employees were both issued letters of concern when they stated that they wanted to remain working in their positions.

Plaintiff sent multiple e-mails to human resources asking for help and, on September 26, 2005, he asked to take a personal day to deal with the situation. Sorey told plaintiff to call him to discuss the request on the phone and Sorey refused the request. Plaintiff insisted that they continue the discussion by e-mail.

Plaintiff contacted Gregg Carr, the Regional Human Resources Manager, with his concerns. Carr told the plaintiff to write up his concerns, which he did in a letter on September 29, 2005. In the letter, plaintiff referred to the incident at the bar with Sorey and stated that he thought that the second meeting between the plaintiff and Sorey was a personal attack.

Carr then told plaintiff to work from home, while defendant investigated plaintiff's claims. During the investigation, Carr spoke with Sorey and the plaintiff about the events

3

at the bar. Carr scheduled an October 28, 2005 meeting with Plaintiff and Regional Sales Director Chris Kelly to inform plaintiff of the results of the investigation and to plan plaintiff's return to work, which defendant asserts included assigning plaintiff a new supervisor. Plaintiff states that he was never informed that he would be assigned a new supervisor.

Plaintiff indicated that he would only attend the October 28, 2005 meeting if he could bring a third party to the meeting, either in person or who would be involved by conference call. Carr offered to have the meeting at a neutral location and permitted plaintiff to bring an Office Depot employee to the meeting. Plaintiff did not want to involve an Office Depot employee. Carr then informed plaintiff that the meeting was rescheduled for Monday, October 31, 2005 at 8 a.m. and because plaintiff refused defendant's previous offers, only the plaintiff, Carr and Kelly would attend the meeting.

Plaintiff never showed at the meeting, despite being warned in a letter and on the phone that if he did not attend, he would be fired. Plaintiff stated that he did not go to the office because he did not want to "face continuing threats, intimidation and ridicule and be cornered by a Regional Sales Manager and an important Human Resources Manager." Specifically, plaintiff states that he was intimidated by Sorey as a result of their interaction at their previous meeting, as well as a result of a number of other factors.

The defendant asserts that when plaintiff did not attend the meeting, he abandoned his job and was fired, effective November 1, 2005. Prior to the meeting, Carr sent plaintiff a letter that stated that the purpose of the meeting was to discuss his manager and his performance and that "the expectations for this meeting did not involve

4

the termination of [his] employment." Plaintiff was also told that if he decided not to come to the meeting, he would then be terminated. When plaintiff did not show, he was terminated effective November 1, 2005.

After he was terminated, the plaintiff worked for his partner and earned no money. Plaintiff did post his resume on a few job websites, as required to collect unemployment. While he states that he contacted personal contacts, he did not contact his former customers, even though he said that he had been constantly offered jobs by them, while working at Office Depot. In August, about 9 months after being fired, plaintiff attended an open house and was offered a job by a builder. Plaintiff took the job and is now leasing apartments and is paid based upon commission.

## II. Summary Judgment

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); see also Cox v. Kentucky Dept. of Transp., 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"

Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also National Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

### III. Analysis

I. Count I Hostile Work Environment

In order to advance an ELCRA hostile work environment claim, the plaintiff must prove:

6

> (1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of sex; (3) the employee was subjected to unwelcome sexual conduct or communication; (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior.

Radtke v. Everett, 442 Mich. 368, 382-383 (1993) (citing MCL 37.2103(h), 37.2202(1)). In this case, the defendant does not dispute that the plaintiff belonged to a protected group or that he was subject to unwelcome sexual communication. Rather defendant argues that the conduct was not "because of sex," that the conduct was not pervasive or severe enough to interfere with plaintiff's employment and that plaintiff has not proven respondeat superior.

### A. Plaintiff has Not Established Harassment on the Basis of Sex

While ELCRA protects plaintiffs from harassment on the basis of their sex, sexual orientation is not a protected category and harassment based upon sexual orientation is not per se proscribed by ELCRA. Barbour v. Dep't of Social Servs., 198 Mich. App. 183 (Mich. App. 1993). A Michigan Appeals court found that same sex sexual harassment is actionable when plaintiff asserted that his supervisor made homosexual advances toward him. Id. at 185-86. The reason homosexual advances are actionable is because the supervisor's advances would then be related to plaintiff's gender. Id.

Similarly, in Oncale v. Sundowner Offshore Services, 523 U.S. 75, 79-80 (1998) the Supreme Court recognized that a plaintiff can prove same sex sexual harassment when there is "credible evidence that the harasser was homosexual." Id. at 80. In

7

addition, the Oncale court stated, "A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace." Id. Finally, the plaintiff may "offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." Id. at 81. In Mayville v. Ford Motor Co., 2006 Mich. App. LEXIS 3226, 13, a Michigan Appeals Court in an unpublished opinion mentioned all the methods from Oncale as possible ways to demonstrate hostile work environment. While plaintiff can prove hostile work environment a few different ways, "(w)hatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "discrimination . . . because of. . . sex." Oncale, 523 U.S. at 81.

Plaintiff does not offer any evidence that Ron Sorey is a homosexual and thus allegedly attempted to kiss the plaintiff because of sex, nor does plaintiff assert that Sorey made derogatory comments that make it clear that Sorey was hostile to men in the workplace. While plaintiff does offer evidence of how the alleged harraser treated both men and women, his evidence actually hurts plaintiff's case. Plaintiff argues that Sorey's calls to female co-workers demonstrate that this is not a single incident of harassment, however, by making this argument plaintiff has admitted that Sorey was an equal opportunity harasser, which is not actionable. While Sorey's actions may have been annoying or offensive, they were not on the basis of sex, since he "harassed" members of both sexes and plaintiff has not proven that the actions towards the plaintiff

were on the basis of sex. Thus, the plaintiff does not have a hostile work environment claim.

### B. The Alleged Conduct was Not Severe or Pervasive

The Michigan Supreme Court has found that there is a "nearly universal consensus of federal authority holding that generally a single incident of sexual harassment will not create a hostile work environment," but the court also recognized that "single incidents may create a hostile work environment–rape and violent sexual assault are two possible scenarios." Radtke v. Everett, 442 Mich. 368, 394 (Mich. 1993). One such extremely traumatic experience may, therefore fulfill the statutory requirements. Id. at 395.

Plaintiff argued that the Radtke court, in a footnote, distinguished Title VII of the Civil Rights Act from Michigan's Elliot Larsen Civil Right's Act on the grounds that federal law requires a showing of "pervasive" and ELCRA does not. Specifically, the Radtke court explains the elements required to establish ELCRA hostile work environment includes, "the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile or offensive work environment." Id. at 383. In the footnote, the court states, "Federal law on the other hand, prohibits 'such conduct [which] has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment. 29 CFR 1604.11(a)(3)(emphasis added). Moreover, federal courts hold that 'for sexual harassment to be actionable, it must be sufficiently severe or pervasive." Id.

While the footnote was meant to distinguish federal law from ELCRA, the court

9

could not have meant that federal law requires a showing that the conduct is pervasive and ELCRA does not, since the Radtke court, later in the opinion, discusses whether the conduct was sufficiently pervasive. As a result, the court must have been distinguishing the two laws on another issue. It appears that the court was distinguishing the laws based upon the fact that ELCRA requires a showing that the conduct "substantially" interfered with the employee's employment, while federal law requires that the conduct "unreasonably" interfered with the employees employment.

No state or federal Sixth Circuit published case identified by the parties or considered by the court is directly on point, but there are some unpublished opinions that address the issue of whether an attempted kiss establishes a hostile work environment. In Shaull v. Michigan Affiliated Health Care System, Inc., 1998 Mich. App. LEXIS 496, 1-2 (Mich. App. 1998), the court found that plaintiff's hostile work environment evidence was insufficient to survive summary disposition when the employee's same-sex supervisor would kiss her on the top of her head, call her "hon," come up behind the plaintiff and hug her, and the employer would sit "like a man with her ankle crossed over her knee, while wearing a skirt." In addition, during a conference at a hotel, the supervisor in Shaull answered their hotel room door completely nude when plaintiff knocked at the supervisor's room to pick up conference materials and the supervisor told another employee to "(t)ell [plaintiff] I'm signing CME certificates in the raw." The Shaull court found that the plaintiff had not presented enough evidence to survive summary judgment.

In this case, the harassment alleged by plaintiff was based upon a single event.[2] In light of the fact that it was only a single instance, the question becomes whether the incident was severe enough to rise to the level of hostile work environment. An alleged kiss is nowhere near the levels of behavior mentioned by the Radtke court, rape and violent sexual assault, that are sufficient to demonstrate hostile work environment based upon a single incident. In addition, other cases have found that a kiss or attempted kiss plus other behavior was not sufficient to establish a hostile work environment. Thus, an attempted kiss, on its own, is not sufficient to demonstrate hostile work environment.

C. Defendant took Immediate Action

Employers can be held liable for hostile work environment only if the employer has notice of the harassment and fails to take "prompt and remedial action." Robyn Chambers v. Trettco, Inc., 463 Mich. 297, 312 (Mich. 2000) (citing Downer v. Detroit Receiving Hosp., 191 Mich. App. 232, 234 (1991)).

After the incident occurred, plaintiff did not report it for many months. During that time, defendant could not be liable for not taking any action, because there is no evidence that defendant had notice of the conduct. The plaintiff alleges that the only action that defendant took was firing plaintiff, but as soon as plaintiff reported the incident defendant started an investigation into the incident and allowed the plaintiff to work from home to avoid contact with Sorey. After the defendant decided that it was unable to substantiate that any harassment occurred, the defendant tried to schedule a

---

[2]Plaintiff argues that this harassment occurred on multiple occasions when Sorey attempted to kiss the plaintiff and when Sorey made calls to female co-employees. The calls cannot be evidence of sexual harassment, because the conduct was directed at women, whereas the plaintiff is a man. As a result, the calls are not evidence of harassment against the plaintiff on the basis on sex.

meeting to organize plaintiff's return to work and assign him a different supervisor. Even if there was harassment, which it appears that there was not, the defendant cannot be held liable since the defendant took prompt and remedial action as soon as the report was made.

II. Count II-Quid Pro Quo

M.C.L. § 37.2103 recognizes two ways to establish quid pro quo harassment. Plaintiffs who rely on M.C.L. § 37.2103(i)(ii), as in this case, must establish: "(1) that she was subject to any of the types of unwelcome sexual conduct or communication described in the statute, and (2) that her employer's agent used her submission to or rejection of the proscribed conduct as a factor in a decision affecting her employment." Champion, 450 Mich. 702, 713 (Mich. 1996); Hartleip, 83 F.3d 767, 775 (6th Cir. 1996). In addition, the Michigan Supreme court has stated, "the party engaged in quid pro quo harassment is almost always, by definition, a supervisor. Quid pro quo harassment occurs only where an individual is in a position to offer tangible job benefits in exchange for sexual favors or, alternatively, threaten job injury for a failure to submit." Champion, 450 Mich. at 713.

Plaintiff argues that no case requires that the person who engages in the conduct be a supervisor at the time of the conduct, but the very essence of quid pro quo is that the person is pressuring an employee to engage in sexual acts in order to receive a job benefit. If the alleged harasser is not a supervisor or does not have influence with a supervisor, they are not in a position to offer job benefits in exchange for sexual favors. There is no allegation that at the time of the conduct Sorey was in a position of authority or that he was able to threaten job injury or promise job benefit based upon influence

with a supervisor. As such, there cannot be quid pro quo harassment.

III. Count III-Retaliation

Plaintiff's third claim is retaliation under MCL 37.2701. In order to establish a prima facie case of retaliation plaintiff must establish that: "(1) he engaged in a protected activity; (2) that this was known by the defendant; (3) the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." Garg v. Macomb Co. Comm. Health Services, 472 Mich. 263, 273 (Mich. 2005); DeFlaviis v. Lord & Taylor, Inc., 223 Mich. App. 432, 436 (Mich. App. 1997). Plaintiff must prove that his participation in protected activity was a "significant factor" in the decision to engage in the adverse employment action, not just that there was a causal connection. Barrett v. Kirtland Community College, 245 Mich. App. 306, 315 (Mich. App. 2001); Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989). "A casual connection can be established through circumstantial evidence, such as close temporal proximity between the protected activity and adverse actions, as long as the evidence would enable a reasonable fact-finder to infer that an action had a discriminatory or retaliatory basis." Rymal v. Baergen, 262 Mich. App. 274, 303 (Mich. App. 2004) (citing Town v. Michigan Bell Telephone Co., 455 Mich. 688, 697 (Mich. 1997)).

For the purposes of the summary judgment motion, the defendant admits that plaintiff engaged in a protected activity, when he complained about Sorey's actions. Since the complaints were made to defendant, the protected activity was known to the defendant, which satisfies the second element of retaliation. Defendant admits to two instances of adverse employment action against plaintiff, when Sorey put plaintiff on a

Performance Improvement Process (PIP)[3] and when defendant terminated plaintiff. As such, it is undisputed that the first three elements of retaliation are present and the only element in dispute is whether there is a casual connection between the adverse employment activity and the plaintiff's protected activity.

Plaintiff has not demonstrated a casual connection between the termination and the report. While timing can be used to demonstrate causation and these elements occurred relatively close in time (plaintiff's complaint to HR was on September 29, 2005 and he was fired effective November 1, 2005), plaintiff's argument that he was fired due to engaging in protected activity is not persuasive in light of the evidence that defendant made efforts to accommodate the plaintiff.

Plaintiff argues that there was a "literal causal connection between his termination and the protected activity," because without the investigation there would have been no meeting. Plaintiff must demonstrate that the protected activity was a "significant factor" in the decision to engage in the adverse employment action, not simply the "but for" cause, as plaintiff does with this argument. Plaintiff also explains that he did not appear at the meeting, because he was intimidated by Sorey. However, the defendant attempted to accommodate plaintiff's fears. Defendant originally offered to have the meeting at a local business establishment away from the office and plaintiff stated that he would only attend the meeting if he were able to bring a third party. While defendant did not allow the plaintiff to bring any third party that the plaintiff wanted, it did state that plaintiff could bring another Office Depot employee to the meeting. After

---

[3]Since plaintiff does not argue that being placed on a PIP was adverse employment action, it is not at issue for the purposes of this motion.

plaintiff refused that offer, the defendant decided to have the meeting at Office Depot. Plaintiff has presented no evidence that defendant was required to have the meeting offsite or that defendant was obligated to allow plaintiff to bring a witness, while defendant has presented evidence that non-union employees have no right to have a witness at a meeting where discipline could occur. See <u>IBM Corporation</u>, 341 NLRB 1288, 1291-1293 (2004).

Even though defendant was not required to have the meeting offsite or to allow the plaintiff to bring an employee witness, defendant attempted to accommodate plaintiff by offering the plaintiff both of these options. When plaintiff did not appear at the meeting after being warned that he would be fired if he decided not to appear, the defendant had sufficient reason to terminate the plaintiff. Since the defendant has presented evidence to show that it had reason to fire the plaintiff and the plaintiff has not presented evidence of a casual connection, the plaintiff has not proven retaliation.

<u>Conclusion</u>

For the reasons stated above, defendant's motion for summary judgment is GRANTED as to all counts.

SO ORDERED.

Dated: August 14, 2007

                                              s/George Caram Steeh  
                                              GEORGE CARAM STEEH  
                                              UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on August 14, 2007, by electronic and/or ordinary mail.

s/Josephine Chaffee
Deputy Clerk